IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CHRISTOPHER JOHNSON,<br>individually and on behalf of all others<br>similarly situated, | ) <br>) <br>) <br>) | |
| and | ) <br>) | |
| SHELBY ZELONIS ROBERSON,<br>individually and on behalf of all others<br>similarly situated, | ) <br>) <br>) | Civil Action No. 1:25-cv-165 |
| Plaintiffs, | ) <br>) <br>) | |
| v. | ) <br>) | |
| ACXIOM LLC, | ) <br>) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Christopher Johnson and Shelby Zelonis Roberson, on behalf of themselves and

all others similarly situated, for their Class Action Complaint against Defendant Acxiom LLC,

state as follows:

## NATURE OF THE CASE

1.      This is a class action brought to vindicate Plaintiffs' rights and those of Virginia

residents under statutory provisions that protect their property rights in their name, image, or

likeness.

2.      Specifically, Defendant Acxiom LLC, a data broker, has been collecting,

processing, and selling or licensing for purposes of trade access to a large volume of data linked

to and including Plaintiffs' names and the names of Virginia residents without first obtaining

written consent as required by Virginia Code sections 18.2-216.1 and 8.01-40.

<u>JURISDICTION AND VENUE</u>

3.      Jurisdiction is proper under 28 U.S.C. § 1332(d) because this is a class action involving more than 100 putative class members, the aggregate amount in controversy among all class members exceeds $5,000,000, exclusive of interest and costs, and there is at least minimal diversity of citizenship.

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), as the property that is the subject of this action is situated in this judicial district.  Specifically, the property at issue is the name, image, or likeness of Plaintiffs and Virginia residents.  The Virginia Supreme Court has expressly held that Virginia residents have a property interest in their names and likeness.

5.      The situs of an interest in intangible personal property (such as one's name, image, and likeness) is the domicile of the owner.

6.      Venue is also proper in this judicial district under 28 U.S.C. section 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims asserted occurred in this judicial district.

<u>PARTIES</u>

7.      Plaintiffs are adult individuals, residents of and domiciled in Fairfax County, Virginia, within this judicial district.

8.      Defendant Acxiom LLC ("Acxiom") is a Delaware limited liability company with its principal place of business in Arkansas.[1]

---

[1]  Unlike traditional diversity jurisdiction, under the Class Action Fairness Act, an unincorporated association is "a citizen of the State where it has its principal place of business and the State under whose laws it is organized."  28 U.S.C.S. § 1332(d)(10); <u>see</u> <u>also</u> <u>Ferrell v.</u> <u>Express Check Advance of S.C. LLC</u>, 591 F.3d 698, 700 (4th Cir. 2010) (holding a limited liability company is an unincorporated association under 28 U.S.C. § 1332(d)(10) and therefore

## PERTINENT PROVISIONS OF THE VIRGINIA CODE

9.     The Commonwealth of Virginia has provided for both criminal penalties and a

statutory private right of action for violating the property rights in one's name, image, and

likeness since 1904.  See Ex. 1, Va. Code § 2897a (1904) (John Garland Pollard, Ed.).

10.     Today, Virginia Code section 18.2-216.1 provides:

> A person, firm, or corporation that knowingly uses for advertising purposes, or for
> the purpose of trade, the name, portrait, or picture of any person resident in the
> Commonwealth, without having first obtained the written consent of such person,
> or if dead, of his surviving consort, or if none, his next of kin, or, if a minor, of his
> or her parent or guardian, as well as that of such minor, shall be deemed guilty of a
> misdemeanor and be fined not less than $50 nor more than $1,000.

Va. Code § 18.2-216.1.

11.     Both Virginia Code section 59.1-68.3 and Code section 59.1-68.5 provide a

private right of action for violations of Virginia Code section 18.2-216.1.  See Va. Code § 59.1-

68.3 (providing for a private right of action, recovery of actual damages or $100, whichever is

greater, and an award of attorney's fees) and Va. Code § 59.1-68.5 (same).

12.     A third provision for a private right of action is found in Virginia Code section

8.01-40:

> **Unauthorized use of name or picture of any person; punitive damages;
> statute of limitations.**
>
> A. Any person whose name, portrait, or picture is used without having first obtained
> the written consent of such person . . . for advertising purposes or for the purposes
> of trade . . . may maintain a suit in equity against the person, firm, or corporation
> so using such person's name, portrait, or picture to prevent and restrain the use
> thereof; and may also sue and recover damages for any injuries sustained by reason
> of such use. And if the defendant shall have knowingly used such person's name,
> portrait or picture in such manner as is forbidden or declared to be unlawful by this
> chapter, the jury, in its discretion, may award punitive damages.

---

is a citizen of the State under whose laws it is organized and the State where it has its principal
place of business).

Va. Code § 8.01-40(A) (emphasis added). [2]

13.     Acxiom has violated all these provisions by knowingly using the names of Plaintiffs and class members for the purposes of trade (i.e., to draw trade to Acxiom's business and to make a profit), without having first obtained their written consent, and is therefore liable to them for actual damages, statutory damages of $100 per class member, injunctive relief, punitive damages, and attorney's fees.

FACTS

14.     Acxiom is one of the largest data brokers in the United States.

15.     Founded in 1969 as a company dedicated to collecting voter information, it rebranded itself as Acxiom and changed its business model to focus on collecting data from a multitude of sources, creating profiles of people living in the United States and throughout the world, and licensing or selling these profiles to businesses and governments.

**A.      Acxiom's Core Business is Trading in Individuals' Names and Other Identity Information Linked to Those Names.  It is Doing So for Purposes of Trade.**

16.     Acxiom's core business involves building detailed profiles of people, integrating consumer data from multiple sources, and ensuring the accuracy and quality of that data – i.e., using software tools and algorithms to confirm the data actually pertains to each individual. Acxiom claims it has personal data relating to approximately 2.6 billion people worldwide[3] and

---

[2] Code section 8.01-40(A) permits an award of punitive damages upon proof that a defendant "knowingly used" another's name, portrait, or picture in violation of the statute.  No proof of actual malice or willful and wanton disregard of the plaintiff's rights is required.

[3] In the Age of Personalization, Acxiom's Data and Identity Solutions Give IPG Mediabrands' Clients a Competitive Edge, Ipgmediabrands, https://www.ipgmediabrands.com/wp-content/uploads/IPGMB_AcxiomAgeofPersonalization_August-12-FINAL.pdf?utm_source=chatgpt.com (last visited Jan. 9, 2025).

that it has collected and culled the personal data of approximately 260 million U.S. citizens, covering 98% of the country's adult population.[4]

17.    Acxiom states that its collection of individuals' personal data includes over 12,000 data attributes (including name, address, social security number, date of birth),[5] many of which are by themselves personal identifiers and which, in the aggregate, are designed to identify and describe each specific individual in detail.

18.    Acxiom's product is the identity of individually identifiable persons.  In fact, Acxiom prides itself on assuring that the data it sells is relevant to marketers because it is culled and quality assured to match each specific individual.[6]

19.    According to Acxiom:

Key components in resolving consumer identity include:

- **Who is this person?** Considering personally identifiable information (PII): name, address, email, mobile number, date of birth, Social Security number or tax ID, along with biometrics and credentials.

- **Where is this person engaging?** Considering device or channel insight, mobile device, smart card, etc.

- **How is this person behaving?** Considering any observed or reported behaviors and actions.[7]

---

[4] Id.

[5] Acxiom Data Catalog, Acxiom, https://www.acxiom.com/cat-acxiom_data_catalog-o/ (last visited Jan. 9, 2025) ("Enhance your understanding of customers – and those you'd love to have – with more than 12,000 global attributes available for enhancement and audience prospecting with Acxiom Infobase®").

[6] See Acxiom InfoBase® - Powerful Insights to Understand People, Acxiom, https://www.acxiom.com/customer-data/infobase/ (last visited Jan. 9, 2025) ("Acxiom InfoBase® delivers accurate and powerful third-party descriptive and touch point data to nearly all addressable U.S. consumers."); see also Acxiom Data Catalog ("With the industry's #1 performing consumer data, our data and audiences are as dynamic as the people they describe, continuously updated and accessible in any marketing channel in real time.)

[7] What is Identity Resolution?, Acxiom, https://www.acxiom.com/identity-resolution/ (last visited Jan. 30, 2025).

20. Thus, the fundamental and essential element of Acxiom's business is trading in and selling or licensing data directly associated with people's names and other identifying information (i.e., information that identifies the individual). In short, Acxiom sells people's identities. That is its business.

21. Although Acxiom repeatedly claims that its data is legally and ethically sourced, which is not the subject of this lawsuit, even these claims are highly suspect based on the nature of the data they collect, which includes items such as geolocation data, data related to individual's consumption or purchase of alcohol, tobacco, and pharmaceutical products, where one works, shops, eats, and lives. And as discussed below, Acxiom even collects data on individuals' religious practices, ethnicity, and other categories of protected and highly sensitive personal data. While the data collected and sold is concerning, equally problematic is how Acxiom shares and discloses this data.

22. As one CNBC commentator recently wrote:

Data brokers have long operated in the shadows of the internet, quietly amassing unprecedented amounts of personal information on billions of people across the globe, but few realize just how deep this data collection really goes. In an age where every move you make online — every click, every purchase, every "like" — is meticulously harvested, packaged, and sold for profit, aggregated personal data has become a valuable commodity, and the global data broker industry is proof of that.[8]

23. In addition to directly trading in individuals' names and other identity information, Acxiom also trades in names and identity information by assigning identifiers that are uniquely associated with a particular individual.

---

[8] Barbara Booth, What internet data brokers have on you — and how you can start to get it back, CNBC (Oct. 11, 2024), https://www.cnbc.com/2024/10/11/internet-data-brokers-online-privacy-personal-information.html.

24. In a recent case filed by the FTC against other data brokers, the FTC's Complaint stated the following with respect to data brokers' false claims that their data is somehow anonymous and not directly tied to specific individuals:

> Respondents' precise geolocation data is not anonymous. Respondents associate their precise geolocation data with unique persistent identifiers, including [mobile advertising IDs ("MAIDs")]. MAID's and similar persistent identifiers are personally identifiable information, as among other things, they allow companies to track and contact individual consumers. MAID's and similar persistent identifiers also allow companies to build profiles of consumers' activities over time.
>
> In addition, identifying consumers by name or other identifying information from Respondents' geolocation data is straightforward, whether through tracking their movements or using services that connect MAIDs to names and other personally identifying information.

In the Matter of Gravy Analytics, Inc & Venntel, Inc., Complaint, FTC File No. 212-3035, ¶¶ 62, 63, and 66 (2024).

25. Acxiom is selling Virginia residents' names and identities without consent and without compensation. These names and identities are the very building blocks of Acxiom's products and services, which start with an accurate and identifiable depiction of each individual. Without these profiles, Acxiom has nothing to sell.

**B.    Recent Changes Inhibiting Websites from Using Third-Party Cookies Have Only Increased Acxiom's Use of Names and Other Identity Information in Trade.**

26. Retailers and other website operators often use "first-party cookies" to enhance the functionality and experience of their websites. These cookies are created and stored by the domain the website visitor is actively visiting, enabling operators to track visitor behavior on their site. First-party cookies enable companies to remember user preferences, such as language settings, theme choices, or login credentials, so users do not have to reset them during subsequent visits. First-party cookies also play a critical role in analytics, allowing website

operators to gather insights about users' interactions, such as page views, time spent on the site, and navigation patterns.  First-party cookies do not track their users' activities on other websites.

27.	So called "third-party cookies" are created and stored by domains that the website user is not actively visiting.  They are typically embedded within the site via third-party content, such as advertisements, social media plugins, or tracking pixels.  Website operators use third-party cookies to enable cross-site tracking and data collection about these users' Internet browsing.  These cookies are commonly used to facilitate and improve targeted advertising because they enable advertisers to collect real-time, specific information about people and their interests as they visit and browse third-party websites on the Internet.

28.	Due to privacy concerns, Apple, Google and other companies that provide Internet browsers, have either stopped permitting the use of third-party cookies or, in the case of Google, have threatened to do so.[9]

29.	This deprecation of these third-party spy cookies has threatened to deprive companies of data they have come to rely upon, leaving an information gap that Acxiom is eager to exploit.

30.	As a result, from 2018 to 2023, spending on identity solutions and services in the United States increased more than threefold, from 3 billion dollars in 2018 to an estimated 10.4 billion dollars in 2023.[10]

31.	Acxiom has compiled a warehouse of names, identifying information, and other personal data collected from multiple sources and has aggregated this data into personal profiles,

---

[9] Stephen Morris, <u>Google Abandons Plan to Remvoe Cookies form Chrome Browser</u>, Financial Times (July 22, 2024), https://www.ft.com/content/cf56a351-9729-4b4c-8936-c512828186e6?utm_source=chatgpt.com.
[10] *ID Resolution H1 2023*, eMarketer (March 2023).

including Plaintiffs' and class members' names and other identifying information. Acxiom sells or licenses and trades this information to and with other companies.

32.     When offering to sell or license individuals' names, identifying information, and other personal data, Acxiom also seeks to bundle its other service offerings,[11] thus using individuals' names and identifying information to trade in its other services.

33.     The following page from Acxiom's website is a sampling of how Acxiom markets its profiles even though this illustration only shows a few of the 12,000 data attributes Acxiom says it sells.[12]



**C. Acxiom Connects Virginians' Names, Personal Identifiers, Personal Data, Sensitive Data, and "Inferences" and Sells or Licenses That Information Without Their Consent.**

34.     Prior to filing this lawsuit, Plaintiff Johnson made a data access request to Acxiom seeking to exercise his rights under Virginia law to review the data Acxiom had

---

[11] Id. (noting on its "Cookieless Solutions" page that Acxiom has "several solutions to help future-proof your marketing strategy" and listing its First Party Identity Graph service, Match Multiplier service, and Visitor Insights service).
[12] Customer Data, Acxiom, https://www.acxiom.com/customer-data/ (last visited Jan. 9, 2025).

collected about him. Mr. Johnson is not a celebrity or a public figure. He is a typical Virginia resident who wanted to know what information Acxiom was collecting and selling about him.

35.     Acxiom responded with a 70-page report that disclosed that it had obtained Mr. Johnson's name, social security number, date of birth, the categories of personal data Acxiom had collected about him, and its conclusions about the data it had collected about Mr. Johnson and his lifestyle, all connected to his name. See Ex. 2 (redacted to protect Mr. Johnson's privacy). Acxiom refers to the conclusions in its report as "inferences."

36.     Examples of the categories of information in the Acxiom report regarding Mr. Johnson include the following:

02. Personal Characteristics / 13. Ethnicity|Religion / Assimilation Level
02. Personal Characteristics / 17. Financial Information / Income - Household - Median
02. Personal Characteristics / 17. Financial Information / Income - Median Family
02. Personal Characteristics / 17. Financial Information / Income Range
02. Personal Characteristics / 17. Financial Information / Income Range – Household
02. Personal Characteristics / 17. Financial Information / Income Range - Premium
02. Personal Characteristics / 17. Financial Information / Income Range – Upper Boundary
02. Personal Characteristics / 69. Inferences-Financial Information / Net Worth Household
03. Personal Property or Buying Activity|Interest / 11. Personal Attributes / Household – Relationship
03. Personal Property or Buying Activity|Interest / 17. Financial Information / Credit - High Credit Range
03. Personal Property or Buying Activity|Interest / 17. Financial Information / Credit Rating
03. Personal Property or Buying Activity|Interest / 82. Buying Activity Behavior-Health and Beauty / Number of Unique Companies Purchased from - Medical or Health
10. Inferences / 67. Inferences-Models / Data Received Date / Income Range
10. Inferences / 67. Inferences-Models / Data Received Date / Income Range – Premium
10. Inferences / 67. Inferences-Models / Diet Lifestyle (1=Very Poor to 7=Very Healthy)
10. Inferences / 67. Inferences-Models / Exercise Frequency
10. Inferences / 67. Inferences-Models / Healthy Lifestyle (1=Low to 7=High)
10. Inferences / 67. Inferences-Models / Likelihood to be Smoker
10. Inferences / 67. Inferences-Models / Likelihood to have Healthy Diet
10. Inferences / 67. Inferences-Models / Overall Wellness
10. Inferences / 67. Inferences-Models / Sleep Quality
10. Inferences / 67. Inferences-Models / Smoking Frequency
10. Inferences / 67. Inferences-Models / Social Setting Behavior
10. Inferences / 67. Inferences-Models / Stress Level
10. Inferences / 69. Inferences-Financial Information / Ability to Pay – Household

10. Inferences / 69. Inferences-Financial Information / Credit Card – Balance Transfers
10. Inferences / 69. Inferences-Financial Information / Credit Risk Measurement – Household
10. Inferences / 69. Inferences-Financial Information / Household – Discretionary Spending Dollars
10. Inferences / 69. Inferences-Financial Information / Income – Disposable Household
10. Inferences / 69. Inferences-Financial Information / Income – Household
10. Inferences / 69. Inferences-Financial Information / Income - Household – Change In Last 12 Months
10. Inferences / 69. Inferences-Financial Information / Income Ratio - Individual to Zip Average Household
10. Inferences / 69. Inferences-Financial Information / Liquid Assets – Annuity Household Regulation B
10. Inferences / 69. Inferences-Financial Information / Liquid Assets – Bonds Household Regulation B
10. Inferences / 69. Inferences-Financial Information / Liquid Assets – Checking Household Regulation B
10. Inferences / 69. Inferences-Financial Information / Liquid Assets – Savings Household Regulation B
10. Inferences / 69. Inferences-Financial Information / Liquid Assets – Securities Household Regulation B
10. Inferences / 69. Inferences-Financial Information / Net Worth Household
10. Inferences / 69. Inferences-Financial Information / Prosperity Index – Household
10. Inferences / 69. Inferences-Financial Information / Spending Power
10. Inferences / 69. Inferences-Financial Information / Wealth Rating Decile
10. Inferences / 70. Inferences-Buying Activity Behavior / Household Dollars Spent - Charitable Donations
10. Inferences / 70. Inferences-Buying Activity Behavior / Household Dollars Spent - Personal Expenses
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Health|Prescription - Express Scripts
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Health|Prescription – Optumrx
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Insurance - Health Blue Cross Blue Shield
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Merchant - Drug Stores and Pharmacies
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Merchant - Financial Services
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Merchant - Health – Prescription Services
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Merchant - Insurance – Health
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Merchant - Legal Services
10. Inferences / 70. Inferences-Buying Activity Behavior / Monthly Likelihood to Spend Retail - CVS – Offline

10. Inferences / 72. Inferences-Health / Body Mass Index estimated
10. Inferences / 72. Inferences-Health / Likelihood to be Responsive Health Treatment Offers
10. Inferences / 72. Inferences-Health / Likelihood to have Food Insecurity
10. Inferences / 72. Inferences-Health / Likelihood to have Interest Allergy Medicine
10. Inferences / 72. Inferences-Health / Likelihood to have Interest Weight Loss Treatment
10. Inferences / 72. Inferences-Health / Likelihood to have Primary Care Physician
10. Inferences / 72. Inferences-Health / Likelihood to have Psa
10. Inferences / 72. Inferences-Health / Likelihood to have flu Shot

37.     A number of these categories raise serious concerns about the potential disclosure to and by Acxiom of Mr. Johnson's personally identifiable health and financial data that Acxiom is using in its models to support the inferences and scores contained in its report.  This was troubling to Mr. Johnson as he could see that a number of Acxiom's "inferences" about him involved the use of sensitive personal data and some of those inferences were wrong.

38.     Acxiom's inferences show that it has collected and trades in vast amounts of data about Plaintiffs and members of the class, and that such data is traded along with their name and other identifying information.

39.     Acxiom claims that its inferences are based on the data collected about each specific individual.  Acxiom therefore likely has hundreds if not thousands of pages of personally identifiable data about each Plaintiff and each member of the class.

40.     In its report, Acxiom does not disclose the identity of the third parties to whom it has sold Mr. Johnson's name, personal identifiers, and his personal data.  Instead, it merely discloses the categories of its trading partners.  For example, Acxiom admits that it has sold or licensed Mr. Johnson's personal information to companies and entities in the following industries: automotive, business services, business services/agency, communications, entertainment, financial services, healthcare, insurance, media and publishing, retail, services non-professional, services professional, and travel and tourism.

41.     Acxiom admits to trading in at least the following categories of Plaintiffs' and class members' personal data: name, personal identifiers, personal characteristics, real and personal property, buying activity/interest, internet activity, geolocation, employment information, education information, and other inferences.

**D.  Acxiom's Extensive Exploitation and Commercialization of Names and Other Identifying Information Is Evident in The Following Representative Acxiom Products and Service Offerings.**

*InfoBase*

42.     InfoBase is Acxiom's comprehensive warehouse of personal data for billions of people located around the world.  This is Acxiom's key product.  By design, InfoBase is purposefully placed as the lead "solution" referenced on Acxiom's website.[13]  Acxiom describes InfoBase as follows:

> InfoBase gives marketers the customer and prospect information to make smarter, faster marketing decisions. With the most accurate, comprehensive, up-to-the-minute data available anywhere, marketers can fully understand their best customers—and find more like them, whether it's via targeted digital display ads, addressable TV, social media, mail, email or phone.[14]

*Unified Data Layer ("UDL")*

43.     UDL is a technology framework licensed or used by Acxiom for its customers to integrate personal data from various sources, creating a centralized repository of individual identities that can be utilized by multiple entities.[15]  Acxiom includes personal data, such as

---

[13] Acxiom, https://www.acxiom.com (last visited Jan. 9, 2025).

[14] Axiom Data Catalogue – For Audience Creation and Analytics, Acxiom, https://marketing.acxiom.com/rs/982-LRE-196/images/Data%20Catalogue%20for%20Audience%20Creation%20and%20Analytics_UK.pdf (last visited Jan. 9, 2025).

[15] Unified Data Layer, Acxiom, https://www.acxiom.com/unified-data-layer/ (last visited Jan. 9, 2025).  As Acxiom explains: "Our unified data platform enables seamless integration of marketing and advertising technologies to acquire, engage, and retain customers. It unites every piece of customer information from across an organization's tech stack."  Id.

identity information, from InfoBase to augment its customers' data. By unifying data tied to a person's identity, UDL enables businesses to understand customer interactions across multiple channels, facilitating consistent and personalized experiences.[16]

***Customer Intelligence Cloud***

*44.* Similar to UDL, Acxiom also provides a product called Customer Intelligence Cloud, a comprehensive suite of services and integrated marketing cloud platforms, including data, identity, and analytics solutions.[17]

***Real ID***

45. Real ID is Acxiom's identity resolution solution.[18] Real ID's primary function is to accurately match and unify individuals' data across various channels and touchpoints creating a comprehensive and cohesive view of each individual.[19] The core of Real ID is a large collection of unique personal data identifiers linked to a single person's name and identity. This data includes, for example, the person's name in combination with unique identifiers that identify the person, such as emails the person has used, their mobile ad IDs, device IDs, cookies, offline identifiers, and platform identifiers.[20] As explained by Acxiom, the key to Acxiom's Real ID product is its ability "to recognize consumers across offline and digital channels . . .

---

[16] Id.

[17] Customer Intelligence Cloud, Acxiom, https://www.acxiom.co.uk/customer-intelligence/cloud/?utm_source=chatgpt.com (last visited Jan. 9, 2025).

[18] Acxiom's Real ID solution and the data that went into creating Real ID is the subject of an ongoing lawsuit. See Adstra, LLC v. Kinesso, LLC, No. 24-CV-02639 (S.D.N.Y filed May 29, 2024). Adstra contends that the "spine" of Real ID – vast quantities of connected names and identifier data – originated from Adstra and was misappropriated by Acxiom (among other claims). See id. Further details regarding Acxiom's alleged misappropriation of Adstra's data are set forth below in paragraphs 51 to 61.

[19] Acxiom Real ID, Acxiom, https://www.acxiom.com/real-id/ (last visited Jan. 9, 2025); see also Identity Resolution Services and Solutions, Acxiom, https://www.acxiom.com/identity-resolution/services-solutions/ (last visited Jan. 9, 2025).

[20] Identity Graphs, Acxiom, https://www.acxiom.com/identity-graph/ (last visited Jan. 9, 2025).

enabl[ing] powerful people-based engagement."[21]   Accordingly, "marketers can use this people-based view to inform all customer engagements across the business – whether that's in analytics, segmentation, targeting, customer service or other areas of the business."[22]

46.      A sample use case for Real ID is a company that has a customer "Jane Doe" who makes multiple purchases but using different email addresses and identities.

47.      Jane may use a VPN, reject cookies, and/or browse the site on her phone, but complete purchases on her desktop, creating fragmented behavior data across devices.  As a result, the company's marketing team is unable to engage in targeted marketing with Jane because they don't understand her tendencies, preferences, or purchase interests.

48.      With Real ID, the company is able to associate these different data sets and merge them into a single identifiable person and profile, thus discovering who Jane Doe is and understanding more about her – more than she intended to share.

49.      Trading on her name and identity, Acxiom violates her privacy.

50.      Acxiom's Real ID solution serves as the engine that Acxiom sells to build and maintain "identity graphs" for its customers.

51.      Identity graphs are data structures that map and connect multiple identifiers uniquely associated with individuals across different touchpoints, devices, and channels.  As illustrated on Acxiom's website:[23]

---

[21] What is Identity Resolution?, Acxiom, https://www.acxiom.com/identity-resolution/ (last visited Jan. 9, 2025).
[22] Id.
[23] Identity Graphs, Acxiom, https://www.acxiom.com/identity-graph/ (last visited Jan. 9, 2025).



**What is an identity graph?**

**Your identity graph is like a keyring**

If you think of all the bits of data you have about a prospect or customers as keys, then your identity graph is like the keyring holding them all together: with a persistent identifier that forms an ongoing tie between a real person and data points such as:

- Mobile IDs
- Browser IDs
- Addressable and connected TV IDs
- Internet of Things (IoT) IDs

- Location IDs
- Email addresses
- Names
- Postal addresses
- Phone numbers

52. Emphasizing the value of its Real ID services, Acxiom provides the following example of the problem associated with a company having a poor identity graph: "[t]he direct mail you get that still, somehow, manages to get your name wrong."[24]

53. The value of Acxiom's products and services all comes down to associating Plaintiffs' and class members' names with the vast trove of personal data Acxiom collects and in which it trades.

---

[24] Id.

54.     The ability to link an individual's name and identity to this vast store of data is so valuable that Acxiom has recently been accused of misappropriating a competitor's trade secrets in order to use that linkage for purposes of trade.  See Adstra, LLC v. Kinesso, LLC and Acxiom, LLC, In the United States District Court for the Southern District of New York, Civil Action No. 1:24-cv-02639.

55.     Specifically, Adstra, LLC, Acxiom's competitor, entered into a data licensing agreement with Kinesso, LLC.  Kinesso, like Acxiom, is a subsidiary of Interpublic Group. Unlike Acxiom, Kinesso was not a direct competitor of Adstra.

56.     The data Adstra licensed to Kinesso (allegedly later misappropriated by Acxiom) included data compiled by Adstra using its proprietary identity resolution algorithm (referred to as "the Adstra Model").

57.     According to Adstra, "The Adstra Model can attribute an individual to his device using 'people detector rules' incorporating digital identity data.  The Adstra Model can also attribute a person to a household by applying proprietary rules that incorporate geospatial location data, IP address affinity, IP address groupings by IP lease, household purchase profiles, contextual device profiles, device utilization, URL site visitation information, and other data – in other words, associating individuals to their devices and analyzing their behavior."  Adstra, LLC v. Kinesso, LLC, Adstra, LLC's Memorandum of Law in Support of its Motion for Partial Summary Judgment at 3 (ECF No. 111) (cleaned up).

58.     The Adstra data includes (i) Terrestrial Identity Keyed Records ("the Terrestrial Data," also called "Link2Me"); (ii) Identity Linkage Data; and (iii) a Digital Identity Graph. Id. at 3-4.

59. The Terrestrial Data is "a dataset comprised of over 30 fields of personally identifiable information ('PII'), [and] resolves to specific individuals and households, which are each assigned a key." Id. at 4.

60. "The Identity Linkage Data consists of log files that associate a hashed email address ('HEM') to non-PII data, including digital identifiers such as email addresses, IP addresses, mobile IDs, advertising identifiers, purchases, user IDs, cookies, and other attributes." Id.

61. "The validated data enables Adstra to make highly accurate linkages between individuals and other attributes." Id.

62. "The Identity Linkage Data links digital identity information to individual identities." Id.

63. "The Digital Identity Graph consists of digital identifier data. As of March 3, 2020, the Digital Identity Graph contained linkages of digital identity data to PII on an individual and household ID level, pertaining to 108 million Households, 230 million Consumers, 600 million Devices, 320 million Mobile Device Ids and 1.2 billion Cookies." Id. at 5 (cleaned up).

64. According to Adstra, Acxiom misappropriated these trade secrets and used them to enhance its own "identity resolution" product.

65. Acxiom did so for purposes of trade, i.e., to draw trade to Acxiom's business and to make a profit.

*Audience Solutions*

66. Acxiom uses its extensive identities and personal data attributes to develop targeted audience segments for its customers (e.g., new parents, new movers, pre-movers,

college students, etc.), enabling Acxiom's customers to identify, reach, and engage customers and prospects across multiple channels.[25]

67.     The most essential element of the provided data segment is the name and other identity information, which allows Acxiom's customers to connect more effectively with their own prospective customers.

68.     A key component of Acxiom's audience solutions offering is a tool called Personicx, which according to Acxiom allows "[c]onsumer segmentation at household, individual and geo levels."[26]

69.     Personicx categorizes individuals and households into distinct clusters based on demographics, behaviors, and life stages.[27]

70.     Within Personicx are several "systems," such as Personicx Prime, Personicx Lifestage, and Personicx Geo.  Personicx Prime's system identifies and segregates data by household and by the individuals living in each household.[28]

71.     An example of this system provided by Acxiom follows:[29]

---

[25] See Acxiom Data Catalog, Acxiom, https://www.acxiom.com/cat-acxiom_data_catalog-o/ (last visited Jan. 9, 2025).
[26] See Id.
[27] Acxiom Personicx® Consumer Segmentation Solutions, Acxiom, https://www.acxiom.com/customer-data/consumer-segmentation-personicx/ (last visited Jan. 10, 2025); see also Personicx® - Segmentation Solutions to Reach and Engage your Best Audiences, Acxiom, https://acxiom.my.salesforce.com/sfc/p/#80000000Lm8w/a/8b000000i4F1/D4BHGhvUt0EMvE vSmy6pocPCiU8wJ22Y1yilYctJY8Q, (last visited Jan. 10, 2025).
[28] Acxiom Personicx® Consumer Segmentation Solutions, Acxiom, https://www.acxiom.com/customer-data/consumer-segmentation-personicx/ (last visited Jan. 10, 2025).
[29] Acxiom Personicx® Prime, Acxiom, https://acxiom.my.salesforce.com/sfc/p/#80000000Lm8w/a/8b000000i4Em/mUcRLTUH0PKcH QAdvJ8wqiqpqnfJ1wqjBjpDfCgaPDE (last visited Jan. 10, 2025).

## WHY PERSONICX PRIME?

With Personicx Prime, Acxiom delivers the most effective balance of individual insights, household context and meaningful segment size, powered by industry-leading data accuracy, coverage and privacy. This provides marketers the foundation needed to design and execute highly successful marketing programs across all addressable channels.

## WHAT IS PERSONICX PRIME?

Personicx Prime is an innovative new segmentation system intended to better represent modern consumers and their interactions in a digitally oriented marketplace. Individuals are first assigned to one of 91 "Prime" segments for a multi-dimensional view of each individual, and then assigned to one of 79 "Person-at-a-Place," or "Place" segments to better understand the household. Fifteen groups are also provided with the system, giving additional organizational structure to the Prime and Place dual clustering system.

**You may think you're addressing sedate Empty Nesters, but in reality you have three distinct personalities within one household:**

- Successful head of household Jack who hopes to retire in 6 years and spend more time tinkering with his vintage car collection

- Active lawyer Mary spends her extra hours volunteering for community causes and is fond of any new tech gadget

- Adult child James has just moved back home to save a little money while he pursues an Executive MBA and works full time



72.     Acxiom's example shows that the essential value of its Personcix solutions is their ability to isolate data by name and identity (e.g., James Jones, Jack Jones, and Mary Jones – three unique individuals). Without trading in name and identity, Acxiom would be unable to sell its Personcix and related "solutions."

*Analytics Solutions and Services*

73.     Acxiom offers its customers various professional services. Acxiom's analytics solutions and services entail its consultants and data scientists using advanced analytic

techniques, machine learning, artificial intelligence and data-driven strategies to solve customer marketing challenges.[30]  These analytics solutions and services are used by its customers, for example, to address customer acquisition, retention, "next best value," and "lifetime value."[31] Acxiom offers its customers the following types of analytics services: descriptive analytics, diagnostic analytics, predictive analytics, and prescriptive analytics.[32]

74.    Acxiom's analytics solutions and services typically integrate with its other offerings.  For example, Acxiom sells its customers combinations of its services including Real ID (its identity resolution service), InfoBase, and its audience segmentation solutions.  For customer retention, for example, Acxiom claims to help clients "[i]dentify high-value customers likely to attrit and pinpoint early behavioural [*sic*] indicators of attrition with which to align preventative efforts."[33]  Acxiom accomplishes this in large part by tying names and identities to personal data.

***Collaboration Solutions***

75.    Acxiom's collaboration solutions are designed to enable businesses to combine, configure, and exchange their first-party data assets.[34]  These solutions facilitate data partnerships and collaborative efforts, allowing two or more organizations to share their first-party data.[35]

---

[30] See Advanced Analytics, Acxiom, https://www.acxiom.co.uk/data-analytics-strategy/advanced-analytics/ (last visited Jan. 10, 2025).
[31] Id.
[32] Data Analytics Services, Acxiom, https://www.acxiom.com/data-analytics-services/ (last visited Jan. 10, 2025).
[33] Advanced Analytics, Acxiom, https://www.acxiom.co.uk/data-analytics-strategy/advanced-analytics/ (last visited Jan. 10, 2025).
[34] See Acxiom Unified Data Layer Collaboration Solutions: Maximize The Power of Your Data, https://www.acxiom.com/wp-content/uploads/2020/07/ac-1250-19-fs-collaboration-solutions.pdf, (last visited Jan. 10, 2025).
[35] See id.

76.     Acxiom provides several examples of how these collaborations work.  For example, "[a] hospitality firm partners with a clothing retailer to target travelers with targeted pre-trip clothing offers."[36]  Also, "[a]uto insurance and auto OEMs share data to optimize prospecting."[37]  In these solutions, a consumer's name and/or identity information are matched with data from the participating organizations.  Once again, Acxiom is enabling businesses to match people's data on an individual basis across businesses by identifying customers by name and personal identifiers.

77.     As illustrated above, Acxiom uses people's names, both as products and in trade, to sell or license its other products and services.  Trading in names, identities, and associated personal data is central to each of its products and services.  Acxiom acknowledges this on its website:

> Identity has always been the cornerstone of customer intelligence, enabling brands to gain a complete view of their customers so they can understand them as real people across channels and devices and better engage with relevance.[38]

78.     Acxiom's parent company, IGC, essentially admits that it is trading in people's personally identifiable data in its February 20, 2024, Annual Report:  "Our business, which increasingly involves the collection, use and transmission of customer data, including personal information, makes us and our agencies attractive targets for malicious third-party attempts to access this data."[39]

---

[36] Id.

[37] Id.

[38] Identity Resolution Services and Solutions, Acxiom, https://www.acxiom.com/identity-resolution/services-solutions/ (last visited Jan. 10, 2025).

[39] The Interpublic Group of Companies, Inc., Form 10-K, at 12 (Feb. 20, 2024), https://investors.interpublic.com/static-files/57bbad75-8744-4ded-b31e-5e318af9da56.

**E. Acxiom's Contracts with The Federal Government Provide Additional Evidence That Acxiom Is Directly Selling People's Names and Identities and that it is Using people's Names and Identities to Trade in its Related Service Offerings.**

79.     Under a contract between Acxiom Corporation and the U.S. General Services Administration (Contract Number GS-35F-0604S), Acxiom has been selling personally identifiable data and related services.

80.     The following are categories of services and data Acxiom sells from its price sheet:[40]

- Find People: Name Address

- Comprehensive Full Report: Aircraft, Associates, Recreational Vehicles, Concealed Weapons, Domain Registration, Driver's License, Full Address History, Hunting/Fishing, Merchant Vessels, Corporate Associations, Phone History, Property Info, People, Pilots, Motor Vehicle Registration, Professional Licenses, Relatives, SSN Info, Vehicle Service Data, Voter Registration, Alias, Contact, DEARegistration, Higher Education.

- Data Package Plus: "Foundation Plus Package - includes demographic data on 49 key elements for marketing/outreach/analytic use including personal, household, real property, purchase behavior and vehicle for marketing purposes."

- Data Package Discovery: "Data Discovery 2 Package - includes an expansive set of 1494 elements for analytic use only, including age, behavior, buying activity, financial, household, interest, real property, life events, etc."

- Data Package Single Advanced Digital: "Advanced geographic, demographic, behavior and interest data. Priced per thousand records input. Traditional Offline Use & Digital Use. Single Element."

- Verify: "Verify is a software service that provides organizations the ability to properly identify and authenticate people with a high degree of accuracy. Verify is the process of inputting information (name, address, ss#, etc) and verifying that the information is accurate and the individual is who they say they are through Acxiom's database and scoring analytics."

---

[40] General Services Administration Federal Supply Service, Authorized Federal Supply Schedule Price List, Contract No. GS-35F-0604S (Sept. 1, 2006 to Aug. 31, 2026), https://www.gsaadvantage.gov/ref_text/GS35F0604S/0WALSL.3S0YRC_GS-35F-0604S_GS35F0604SACXIOMPRICELIST20210901.PDF.

- Authenticate: "Authenticate is a software service that provides organizations the ability to properly identify and authenticate people with a high degree of accuracy. Verify is the process of inputting information (name, address, ss#, etc) and verifying that the information is accurate and the individual is who they say they are through Acxiom's database and scoring analytics."

- AbiliTec Link Conversion – Internal: "AbiliTec Consumer Link Append-Internal Links - for up to 33,000,000 (33 Million) records per month, 12 month minimum. Price per thousand processed. 33,000,000 monthly minimum records processed."

81.     Acxiom's price list provides multiple examples of Acxiom collecting, processing, and selling or licensing names, personal data, and other identifying information in trade. Verify, for example, requires a user to input a person's name for Acxiom to then verify the person's identity.

## PERSONAL JURISDICTION

82.     For the following reasons, specific jurisdiction is appropriate under the Virginia long arm statute. See Va. Code § 8.01-328.1.[41]

83.     The Virginia Supreme Court has held that using a Virginia resident's name or likeness in the manner described above constitutes conversion of property, a common law tort.

84.     As noted above, the situs of intangible personal property (such as one's name, image, and likeness) is the domicile of the owner.

85.     Plaintiffs are both residents and domiciliaries of the Commonwealth of Virginia. Therefore, the situs of their property interest in their name, image, and likeness is the Commonwealth of Virginia.

86.     The claims asserted here thus arise from Acxiom "[c]ausing tortious injury by an act or omission in this Commonwealth." Va. Code § 8.01-328.1(A)(3).

---

[41]  Should Acxiom deny these allegations, Plaintiff will request jurisdictional discovery to further support them.

87.     Alternatively, the claims asserted here arise from Acxiom "[c]ausing tortious injury in this Commonwealth by an act or omission outside this Commonwealth."  Va. Code § 8.01-328.1(A)(4).

88.      Acxiom regularly does or solicits business, or engages in any other persistent course of conduct (such as described above), or derives substantial revenue from goods used or consumed or services rendered, in the Commonwealth.  See id.

89.     Acxiom also uses a computer and/or computer network server located in Virginia to accomplish the acts identified above, which constitutes an act in the Commonwealth under Virginia's long-arm statute.  Va. Code § 8.01-328.1(B).

## CLASS ACTION ALLEGATIONS

90.     The proposed Class consists of hundreds of thousands or millions of persons; thus the members of the Class are so numerous that joinder of all Class members is impracticable.

91.     The following are questions of law or fact common to the Class:

- Whether Acxiom violated Virginia Code section 8.01-40;

- Whether Acxiom violated Virginia Code section 18.2-216.1;

- Whether Acxiom is liable for actual damages;

- Whether Acxiom is liable for statutory damages;

- Whether Acxiom knowingly used Plaintiffs' and class members' names, portraits, or pictures in such manner as is forbidden or declared to be unlawful, thereby warranting an award of punitive damages;

- Whether injunctive relief should be granted to Class members.

92.     Further, Plaintiffs' claims are typical of the claims of the Class as the underlying facts and the violations alleged are precisely the same for all members of the proposed Class.

93.     Moreover, Plaintiffs will fairly and adequately protect the interests of the Class as they have no interests that are adverse or antagonistic to those of the proposed Class.

94.     Consistent with Federal Rule of Civil Procedure 23(b)(2), Acxiom has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole

95.     Finally, consistent with Federal Rule of Civil Procedure 23(b)(3), questions of law or fact common to putative Class members predominate over questions affecting only individual members and a class action is superior to other available methods (i.e., individual pursuit of litigation) for fairly and efficiently adjudicating the controversy.

96.     The proposed Class is as follows:

All Virginia residents whose names, portraits, or pictures were used by Acxiom for advertising or for purposes of trade, within the past five years, without having first obtained their written consent.

97.     Plaintiff reserves the right to amend this Class definition.

COUNT 1: VIOLATION OF VIRGINIA CODE SECTION 18.2-216.1

98.     The previous allegations are incorporated.

99.     By virtue of the facts stated above, Acxiom knowingly used Plaintiffs' names and the names of class members for purposes of trade, without having first obtained their written consent, in violation of Virginia Code section 18.2-216.1.

100.    As a result of these knowing violations, Plaintiffs and members of the Class have been damaged.

101.    Pursuant to Code sections 59.1-68.3 and 59.1-68.5, Plaintiffs and members of the Class are entitled to recover actual damages, or $100, whichever is greater, and their reasonable attorney's fees.

## COUNT 2: VIOLATION OF VIRGINIA CODE SECTION 8.01-40

102. The previous allegations are incorporated.

103. By virtue of the facts stated above, Acxiom knowingly used Plaintiffs' names and the names of class members for purposes of trade in violation of Virginia Code section 8.01-40.

104. As a result of these knowing violations, Plaintiffs and members of the class have been damaged.

105. Pursuant to Virginia Code section 8.01-40, Plaintiffs and members of the class are entitled to recover damages for any injuries sustained by reason of such use, punitive damages, and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A. That this Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), in accordance with the class description proposed above and award declaratory relief and injunctive relief prohibiting Defendant from continuing the practices identified above;

B. That this Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), in accordance with the class description proposed above;

C. An award of statutory damages;

D. An award of compensatory damages;

E. An award of punitive damages;

F. An award of attorney's fees and costs;

G. Preliminary and permanent injunctive relief; and,

H. Such other and further relief as to the Court may appear just.

## JURY DEMAND

Trial by jury is demanded as to all claims.

Dated: January 30, 2025

Respectfully submitted,

 */s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
Webster Book LLP
2300 Wilson Blvd., Suite 728
Arlington, VA 22201
(888) 987-9991 (telephone and fax)
swebster@websterbook.com

Andrew Levetown (*pro hac vice* forthcoming)
Levetown Law, LLP
1439 Woodhurst Blvd.
McLean, VA 22102
(703) 618-2264
andrew@levetownlaw.com

Todd S. McClelland (*pro hac vice* forthcoming)
Sterlington PLLC
One World Trade Center
85th Floor
New York, NY 10007
(404) 483-6976
todd.mcclelland@sterlingtonlaw.com

*Counsel for Plaintiffs and the Proposed Class*