IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SHELBY ZELONIS ROBERSON, *et al.*,      ) | |
|                            ) | |
|         Plaintiffs,         ) | |
|                             ) | |
|         v.                     ) | Civil Action No. 1:25-cv-165 (RDA/IDD) |
|                             ) | |
| ACXIOM LLC,             ) | |
|                             ) | |
|         Defendant.        ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Acxiom LLC's Motion to Dismiss (the "Motion") (Dkt. 11). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering the Complaint (Dkt. 1), Defendant's Memorandum in Support (Dkt. 12), Plaintiffs' Opposition (Dkt. 19), and Defendant's Reply (Dkt. 20), this Court GRANTS the Motion for the reasons that follow.

### I. BACKGROUND

#### A. Factual Background[1]

Acxiom is one of the largest data brokers in the United States. Dkt. 1 ¶ 14. Founded in 1969 as a company dedicated to collecting voter information, it rebranded itself as Acxiom and changed its business model to focus on collecting data from a multitude of sources, creating profiles of people living in the United States and throughout the world, and licensing or selling these profiles to businesses and governments. *Id.* ¶ 15.

---

[1] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

Acxiom's core business involves building detailed profiles of people, integrating consumer data from multiple sources, and ensuring the accuracy and quality of that data—*i.e.*, using software tools and algorithms to confirm the data actually pertains to each individual. *Id.* ¶ 16. Acxiom claims it has personal data relating to approximately 2.6 billion people worldwide and that it has collected and culled the personal data of approximately 260 million U.S. citizens, covering 98% of the country's adult population. *Id.* Acxiom states that its collection of individuals' personal data includes over 12,000 data attributes (including name, address, social security number, date of birth), many of which are by themselves personal identifiers and which, in the aggregate, are designed to identify and describe each specific individual in detail. *Id.* ¶ 17. Acxiom's product is the identity of these individually identifiable persons. *Id.* ¶ 18. In fact, Acxiom prides itself on assuring that the data it sells is relevant to marketers because it is culled and quality assured to match each specific individual. *Id.* ¶ 18. According to Acxiom, key components in resolving consumer identity include:

- Who is this person? Considering personally identifiable information ("PII"): name, address, email, mobile number, date of birth, Social Security number or tax ID, along with biometrics and credentials.

- Where is this person engaging? Considering device or channel insight, mobile device, smart card, etc.

- How is this person behaving? Considering any observed or reported behaviors and actions.

*Id.* ¶ 19. Acxiom collects geolocation data, data related to individuals' consumption or purchase of alcohol, tobacco, and pharmaceutical products, where one works, shops, eats, and lives, and individuals' religious practices, ethnicity, and other categories of protected and highly sensitive personal data. *Id.* ¶ 21. Thus, the fundamental and essential element of Acxiom's business is trading in and selling or licensing data directly associated with people's names and other

identifying information (*i.e.*, information that identifies the individual). *Id.* ¶ 20. In short, Acxiom sells people's identities as its business. *Id.* In addition to directly trading in individuals' names and other identity information, Acxiom also trades in names and identity information by assigning identifiers that are uniquely associated with a particular individual. *Id.* ¶ 23.

Retailers and other website operators often use "first-party cookies" to enhance the functionality and experience of their websites. *Id.* ¶ 26. These cookies are created and stored by the domain the website visitor is actively visiting, enabling operators to track visitor behavior on their site. *Id.* First-party cookies enable companies to remember user preferences, such as language settings, theme choices, or login credentials, so users do not have to reset them during subsequent visits. *Id.* First-party cookies also play a critical role in analytics, allowing website operators to gather insights about users' interactions, such as page views, time spent on the site, and navigation patterns. *Id.* First-party cookies do not track their users' activities on other websites. *Id.*

So called "third-party cookies" are created and stored by domains that the website user is not actively visiting. *Id.* ¶ 27. They are typically embedded within the site via third-party content, such as advertisements, social media plugins, or tracking pixels. *Id.* Website operators use third-party cookies to enable cross-tracking and data collection about these users' internet browsing. *Id.* These cookies are commonly used to facilitate and improve targeted advertising because they enable advertisers to collect real-time, specific information about people and their interests as they visit and browse third-party websites on the internet. *Id.* Due to privacy concerns, Apple, Google, and other companies that provide internet browsers have either stopped permitting the use of third-party cookies or, in the case of Google, have threatened to do so. *Id.* ¶ 28. This has threatened to deprive companies of data they have come to rely upon, leaving an information gap. *Id.* ¶ 29. As

a result, from 2018 to 2023 spending on identity solutions and services in the United States increased more than threefold, from 3 billion dollars in 2018 to an estimated 10.4 billion dollars in 2023. *Id.* ¶ 30.

Acxiom has compiled an electronic warehouse of names, identifying information, and other personal data collected from multiple sources and has aggregated this data into personal profiles, including Plaintiffs' and class members' names and other identifying information. *Id.* ¶ 31. Acxiom sells or licenses and trades this information to and with other companies. *Id.* When offering to sell or license individuals' names, identifying information, and other personal data, Acxiom also seeks to bundle its other service offerings. *Id.* ¶ 32.

Prior to filing this lawsuit, Plaintiff Johnson made a data access request to Acxiom seeking to review the data Acxiom had collected about him. *Id.* ¶ 34. Acxiom responded with a 70-page report that disclosed that it had obtained Johnson's social security number, date of birth, extensive categories of personal data (including, for example, "ethnicity/religion" and "assimilation level"), and its conclusions about Johnson and his lifestyle (including, for example, "diet lifestyle," "exercise frequency," "sleep quality," "stress level," "net worth household," and "monthly likelihood to spend" on various merchants)—all connected to his name. *Id.* ¶¶ 35, 36; Dkt. 1-2. This was troubling to Johnson as he could see that a number of Acxiom's inferences about him involved the use of sensitive personal data and some of those inferences were wrong. Dkt. 1 ¶ 37. Acxiom claims that its inferences are based on the data collected about each specific individual. *Id.* ¶ 39. Plaintiff alleges that Acxiom likely has hundreds if not thousands of pages of personally identifiable data about each Plaintiff and each member of the class. *Id.* ¶ 39.

In its report, Acxiom does not disclose the identity of the third parties to whom it has sold Johnson's name, personal identifiers, and his personal data. *Id.* ¶ 40. Instead, it discloses the

categories of its trading partners. *Id.* For example, Acxiom admits that it has sold or licensed Johnson's personal information to companies and entities in the following industries: automotive, business services, business services/agency, communications, entertainment, financial services, healthcare, insurance, media and publishing, retail, services non-professional, services professional, and travel and tourism. *Id.* Acxiom admits to selling at least the following categories of Plaintiffs' and class members' personal data: name, personal identifiers, personal characteristics, real and personal property, buying activity/interest, internet activity, geolocation, employment information, education information, and other inferences. *Id.* ¶ 41.

InfoBase is Acxiom's comprehensive electronic warehouse of personal data for billions of people located around the world. *Id.* ¶ 42. This is Acxiom's key product. *Id.* By design, InfoBase is purposefully identified as the lead "solution" referenced on Acxiom's website. *Id.* Acxiom describes InfoBase as follows:

> InfoBase gives marketers the customer and prospect information to make smarter, faster marketing decisions. With the most accurate, comprehensive, up-to-the-minute data available anywhere, marketers can fully understand their best customers—and find more like them, whether it's via targeted digital display ads, addressable TV, social media, mail, email or phone.

*Id.*

UDL is a technology framework licensed or used by Acxiom for its customers to integrate personal data from various sources, creating a centralized repository of individual identities that can be utilized by multiple entities. *Id.* ¶ 43. Acxiom includes personal data, such as identity information, from InfoBase to augment its customers' data. *Id.* ¶ 43. By unifying data tied to a person's identity, UDL enables businesses to understand customer interactions across multiple channels, facilitating consistent and personalized experiences. *Id.*

5

Similar to UDL, Acxiom also provides a product called Customer Intelligence Cloud, a comprehensive suite of services and integrated marketing cloud platforms, including data, identity, and analytics solutions. *Id.* ¶ 44.

Real ID is Acxiom's identity resolution solution. *Id.* ¶ 45. Real ID's primary function is to accurately match and unify individuals' data across various channels and touchpoints creating a comprehensive and cohesive view of each individual. *Id.* The core of Real ID is a large collection of unique personal data identifiers linked to a single person's name and identity. *Id.* This data includes, for example, the person's name in combination with unique identifiers that identify the person, such as emails the person has used, their mobile ad IDs, device IDs, cookies, offline identifiers, and platform identifiers. *Id.* As explained by Acxiom, the key to Acxiom's Real ID product is its ability "to recognize consumers across offline and digital channels . . . enabl[ing] powerful people-based engagement." *Id.* Accordingly, "marketers can use this people-based view to inform all customer engagements across the business – whether that's in analytics, segmentation, targeting, customer service or other areas of the business." *Id.*

A sample use case for Real ID is a company that has a customer "Jane Doe" who makes multiple purchases but using different email addresses and identities. *Id.* ¶ 46. Jane may use a VPN, reject cookies, and/or browse the site on her phone, but complete purchases on her desktop, creating fragmented behavior data across devices. *Id.* ¶ 47. As a result, the company's marketing team is unable to engage in targeted marketing with Jane because they don't understand her tendencies, preferences, or purchase interests. *Id.* With Real ID, the company is able to associate these different data sets and merge them into a single identifiable person and profile, thus discovering who Jane Doe is and understanding more about her – more than she intended to share. *Id.* ¶ 48.

Acxiom's Real ID solution serves as the engine that Acxiom sells to build and maintain "identity graphs" for its customers. *Id.* ¶ 50. Identity graphs are data structures that map and connect multiple identifiers uniquely associated with individuals across different touchpoints, devices, and channels. *Id.* ¶ 51. Acxiom describes an identity graph as "like a keyring." *Id.* "If you think of all the bits of data you have about a prospect or customers as keys, then your identity graph is like the keyring holding them all together with a persistent identifier that forms an ongoing tie between a real person and data points such as: Mobile IDs, Browser IDs, Addressable and connected TV IDs, Internet of Things (IoT) IDs, Location IDs, Email addresses, Names, Postal addresses, [and] Phone numbers." *Id.* Emphasizing the value of its Real ID services, Acxiom provides the following example of the problem associated with a company having a poor identity graph: "[t]he direct mail you get that still, somehow, manages to get your name wrong." *Id.* ¶ 52. The value of Acxiom's products and services all comes from associating Plaintiffs' and class members' names with the vast trove of personal data Acxiom collects and which it sells. *Id.* ¶ 53.

Acxiom uses its extensive identities and personal data attributes to develop targeted audience segments for its customers (*e.g.*, new parents, new movers, pre-movers, college students, etc.), enabling Acxiom's customers to identify, reach, and engage customers and prospects across multiple channels. *Id.* ¶ 66. The most essential element of the provided data segment is the name and other identity information, which allows Acxiom's customers to connect more effectively with their own prospective customers. *Id.* ¶ 67. A key component of Acxiom's audience solutions offering is a tool called Personicx, which according to Acxiom allows "[c]onsumer segmentation at household, individual and geo levels." *Id.* ¶ 68. Personicx categorizes individuals and households into distinct clusters based on demographics, behaviors, and life stages. *Id.* ¶ 69. Within Personicx are several "systems," such as Personicx Prime, Personicx Lifestage, and

Personicx Geo. *Id.* ¶ 70. Personicx Prime's system identifies and segregates data by household and by the individuals living in each household. *Id.* An example of this system provided by Acxiom presents its findings about "the Jones Household." *Id.* ¶ 71. Acxiom states: "You may think you're addressing sedate empty nesters, but in reality of you have three distinct personalities within one household: Successful head of household Jack who hopes to retire in 6 years and spend more time tinkering with his vintage car collection[;] Active lawyer Mary spends her extra hours volunteering for community causes and is fond of any new tech gadget[;] Adult child James has just moved back home to save a little money while he pursues an Executive MBA and works full time." *Id.* Acxiom's example shows that the essential value of its Personcix solutions is their ability to isolate data by name and identity (*e.g.*, James Jones, Jack Jones, and Mary Jones – three unique individuals). *Id.* ¶ 72. Without selling names and identities, Acxiom would be unable to sell its Personcix and related "solutions." *Id.*

Acxiom offers its customers various professional services. Acxiom's analytics solutions and services entail its consultants and data scientists using advanced analytic techniques, machine learning, artificial intelligence and data-driven strategies to solve customer marketing challenges. *Id.* ¶ 73. These analytics solutions and services are used by its customers, for example, to address customer acquisition, retention, "next best value," and "lifetime value." *Id.* Acxiom offers its customers the following types of analytics services: descriptive analytics, diagnostic analytics, predictive analytics, and prescriptive analytics. *Id.* Acxiom's analytics solutions and services typically integrate with its other offerings. *Id.* ¶ 74. For example, Acxiom sells its customers combinations of its services including Real ID (its identity resolution service), InfoBase, and its audience segmentation solutions. *Id.* For customer retention, for example, Acxiom claims to help clients "[i]dentify high-value customers likely to attrit and pinpoint early behavioural [sic]

indicators of attrition with which to align preventative efforts." *Id.* Acxiom accomplishes this in large part by tying names and identities to personal data. *Id.*

Acxiom's collaboration solutions are designed to enable businesses to combine, configure, and exchange their first-party data assets. *Id.* ¶ 75. These solutions facilitate data partnerships and collaborative efforts, allowing two or more organizations to share their first-party data. *Id.* Acxiom provides several examples of how these collaborations work. *Id.* ¶ 76. For example, "[a] hospitality firm partners with a clothing retailer to target travelers with targeted pre-trip clothing offers." *Id.* Also, "[a]uto insurance and auto OEMs share data to optimize prospecting." *Id.* In these solutions, a consumer's name and/or identity information are matched with data from the participating organizations. *Id.* Once again, Acxiom is enabling businesses to match people's data on an individual basis across businesses by identifying customers by name and personal identifiers. *Id.*

Acxiom uses people's names to sell or license its other products and services. *Id.* ¶ 77. Plaintiff asserts that trading in names, identities, and associated personal data is central to each of its products and services. *Id.* Acxiom acknowledges this on its website:

> Identity has always been the cornerstone of customer intelligence, enabling brands to gain a complete view of their customers so they can understand them as real people across channels and devices and better engage with relevance.

*Id.* Acxiom's parent company, IGC, stated in its February 20, 2024 Annual Report: "Our business, which increasingly involves the collection, use and transmission of customer data, including personal information, makes us and our agencies attractive targets for malicious third-party attempts to access this data." *Id.* ¶ 78.

Under a contract between Acxiom Corporation and the U.S. General Services Administration, Acxiom has been selling personally identifiable data and related services. *Id.* ¶ 79. The following are categories of services and data Acxiom sells from its price sheet:

- Find People: Name Address

- Comprehensive Full Report: Aircraft, Associates, Recreational Vehicles, Concealed Weapons, Domain Registration, Driver's License, Full Address History, Hunting/Fishing, Merchant Vessels, Corporate Associations, Phone History, Property Info, People, Pilots, Motor Vehicle Registration, Professional Licenses, Relatives, SSN Info, Vehicle Service Data, Voter Registration, Alias, Contact, DEARegistration, Higher Education.

- Data Package Plus: "Foundation Plus Package - includes demographic data on 49 key elements for marketing/outreach/analytic use including personal, household, real property, purchase behavior and vehicle for marketing purposes."

- Data Package Discovery: "Data Discovery 2 Package - includes an expansive set of 1494 elements for analytic use only, including age, behavior, buying activity, financial, household, interest, real property, life events, etc."

- Data Package Single Advanced Digital: "Advanced geographic, demographic, behavior and interest data. Priced per thousand records input. Traditional Offline Use & Digital Use. Single Element."

- Verify: "Verify is a software service that provides organizations the ability to properly identify and authenticate people with a high degree of accuracy. Verify is the process of inputting information (name, address, ss#, etc) and verifying that the information is accurate and the individual is who they say they are through Acxiom's database and scoring analytics."

- Authenticate: "Authenticate is a software service that provides organizations the ability to properly identify and authenticate people with a high degree of accuracy. Verify is the process of inputting information (name, address, ss#, etc) and verifying that the information is accurate and the individual is who they say they are through Acxiom's database and scoring analytics."

- AbiliTec Link Conversion – Internal: "AbiliTec Consumer Link Append-Internal Links - for up to 33,000,000 (33 Million) records per month, 12 month minimum. Price per thousand processed. 33,000,000 monthly minimum records processed."

*Id.* ¶ 80.

### B. Procedural Background

On January 30, 2025, Plaintiffs filed their Complaint, asserting two counts: (1) violation of Code of Virginia § 18.2-216.1, and (2) violation of Code of Virginia § 8.01-40. Dkt. 1. On April 14, 2025, Defendant filed its Motion to Dismiss. Dkt. 11. On May 14, 2025, Plaintiffs filed their Opposition. Dkt. 19. On May 28, 2025, Defendant filed its Reply. Dkt. 20.

## II. LEGAL STANDARD

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to

11

the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III. ANALYSIS

In its Motion, Defendant argues that Plaintiffs fail to state a claim under Code of Virginia § 8.01-40 or § 18.2-216.1 because they have not alleged Acxiom "used" their names for "the purposes of trade," as required under both statutes.[2] Dkt. 12 at 10. The parties (and the Court) have identified only one Virginia state court case addressing the issue, *U.S. News & World Rep., Inc. v. Avrahami*, 1996 WL 1065557 (Va. Cir. Ct. June 13, 1996). In that case, relying on *Lavery v. Automation Management Consultants, Inc.*, 234 Va. 145 (1987), and *Town & Country Properties, Inc. v. Riggins*, 249 Va. 387 (1995), the Circuit Court concluded that "[t]he inclusion of an individual name as part of a mailing list constitutes neither a use for an advertising purpose nor a use for the purpose of trade, as defined by [Section 8.01-40]." *Avrahami*, 1996 WL 1065557, at *7; *see also id.* at *6 ("The exchange, sale, or rental of mailing lists, which . . . comprise[] . . . individual names and addresses, does not violate Virginia Code section 8.01-40."). This interpretation is consistent with right-to-publicity cases in other jurisdictions. *See, e.g., Huston v. Hearst Commc'ns, Inc.*, 2022 WL 385176, at *3 (C.D. Ill. Feb. 7, 2022) (dismissing claim where the plaintiff "allege[d] that Hearst made mailing lists of its subscribers available for others to

---

[2] Section 18.2-216.1 provides that "[a] person, firm, or corporation that knowingly uses for advertising purposes, or for the purpose of trade, the name, portrait, or picture of any person resident in the Commonwealth, without having first obtained the written consent of such person, . . . shall be deemed guilty of a misdemeanor . . . ." Sections 59.1-68.3 and 59.1-68.5 provide a private cause of action to enforce this provision.

Section 8.01-40(A) provides that "[a]ny person whose name, portrait, or picture is used without having first obtained the written consent of such person . . . for advertising purposes or for the purposes of trade, such persons may maintain a suit in equity against the person, firm, or corporation so using such person's name, portrait, or picture . . . ."

purchase so that they can send advertisements to the subscribers") (citing *Avrahami*, 1996 WL 1065557), *aff'd,* 53 F.4th 1097 (7th Cir. 2022). These include cases involving extensive databases like the one at issue here. *See, e.g.*, *Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837, at *4-5 (N.D. Cal. Aug. 16, 2021) (dismissing right-to-publicity claim where the plaintiffs alleged that the defendant "aggregates both public and non-public information about millions of people" to create "detailed cradle-to-grave dossiers on each person, including names, photographs, criminal history, relatives, associates, financial information, and employment information" and then sells this information to customers for significant profits because, "[a]though the publishing of [the plaintiffs'] most private and intimate information for profit might be a gross invasion of their privacy, it is not a misappropriation of their name or likeness to advertise or promote a *separate* product or service").

In their Opposition, Plaintiffs argue that the Court should instead follow a Northern District of Illinois case, *In re Clearview AI, Inc. Consumer Priv. Litig.*, 585 F. Supp. 3d 1111 (N.D. Ill. 2022), which briefly addressed Section 8.01-40, *id.* at 1127, in a lengthy opinion largely addressing other issues. The *Clearview* case appears to be an outlier and is otherwise unpersuasive where the specific argument raised here was not presented to that court, and it thus did not address the body of case law recounted *supra*. Specifically, in *Clearview*, the defendants were alleged to have "covertly scraped over three billion photographs of facial images from the internet and then used artificial intelligence algorithms to scan the face geometry of each individual depicted to harvest the individuals' unique biometric identifiers and corresponding biometric information" and then licensed access to "a searchable database containing this biometric information and data." *Id.* at 1120. At the motion-to-dismiss stage, the defendants had argued that the plaintiffs had failed to allege that any use of their photographs was "for advertising purposes," but the defendants had

13

failed to consider that the plaintiffs could alternatively state a claim under the statute's "for purposes of trade" clause. *Id.* In its analysis, the *Clearview* court quoted an opinion by this District Judge, which stated generally that, "[i]n determining whether the use was 'for the purposes of trade,' courts are to consider whether the name was used to draw trade to an entity." *Goodweather v. Parekh*, 2020 WL 9259760, at *10 (E.D. Va. Sept. 18, 2020). The *Clearview* court then, without further explanation, concluded that the plaintiffs in its case had "sufficiently alleged that the Clearview defendants profited from the unconsented use of their likenesses under 'for purposes of trade.'" 585 F. Supp. 3d at 1127. But neither the quote nor the ultimate holding in this Court's prior case stand for the proposition that "profiting" from the sale of names (or pictures) is sufficient by itself to qualify as "us[ing]" such names (or pictures) "for purposes of trade." Indeed, the facts of this Court's prior case are clearly distinguishable from those presented in both *Clearview* and here. There, the Court held that allegations that the defendant altered a copy of a check to add the plaintiff's name in order to continue a façade that the plaintiff was running an organization so that the defendant could obtain a government contract were sufficient to state a claim under Section 8.01-40(A). *Goodweather*, 2020 WL 9259760, at *10-11. In other words, the defendant had associated the plaintiff's name with an organization in a way that implied endorsement in order to draw trade to that organization. Moreover, after the Northern District of Illinois issued the *Clearview* decision, the Seventh Circuit (in which the Northern District of Illinois sits) affirmed the dismissal of a mailing list case, citing the Virginia Circuit Court's *Avrahami* case approvingly. *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1101 (7th Cir. 2022). Accordingly, because the *Clearview* court relied only on this Court's prior opinion and otherwise did not address the authority recounted *supra* and the Seventh Circuit's subsequent decision has undermined the

14

holding of *Clearview* and underscored the decision in *Avrahami*, the Court finds the *Clearview* court's interpretations of Section 8.01-40 and this Court's prior decision unpersuasive.[3]

In sum, although Acxiom's alleged collection of data far exceeds the scope of a traditional mailing list, the Virginia statutes asserted here ultimately protect only a person's name, portrait, or picture, not any of this other data. And Plaintiffs do not make any allegations regarding their portraits or pictures. Thus, the core of the issue here too is whether selling a list of names for other entities to later use for advertising purposes constitutes a "use" "for the purposes of trade" under Code of Virginia Sections 8.01-40 and 18.2-216.1. A Virginia court—consistent with decisions from other courts addressing this issue—has specifically answered "no." *See Avrahami*, 1996 WL 1065557, at *6-7. The Circuit Court's interpretation is consistent with the plain meaning of the statutes and case law from the Supreme Court of Virginia on the statutes. *See Lavery*, 234 Va. at 151 (1987) (comparing the right to a trademark in one's name and likeness); *Riggins*, 249 Va. at 394 (1995) ("Claims based, as here, on the use of a name 'for advertising purposes' have received a more liberal treatment by the courts than those based on use 'for purposes of trade.'"). Accordingly, although the Court is troubled by the extensive allegations in the Complaint, Plaintiffs have failed to plausibly allege that these allegations constitute a violation of the specific statutes under which they have brought this action.

## IV. CONCLUSION

Accordingly, it is hereby ORDERED that Defendant Acxiom LLC's Motion to Dismiss (Dkt. 11) is GRANTED; and it is

---

[3] Plaintiffs also attempt to avoid dismissal by pointing to certain Acxiom documents discussing the "use" of the personal data, but those documents make clear that the only "use" is the sale of the data to Acxiom's customers for the customers' marketing purposes. Dkt. 19 at 5-7. Accordingly, Plaintiffs' argument is somewhat unclear and otherwise does not change the Court's analysis.

FURTHER ORDERED that, it appearing to the Court that amendment would be futile, the Complaint (Dkt. 1) is DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
March 25 , 2026

/s/

Rossie D. Alston, Jr.
United States District Judge

16